UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| JULIUS DAVIS, | : |
| Petitioner, | : Civ. No. 18-4260 (FLW) |
| v. | : |
| GEORGE ROBINSON et al., | : **OPINION** |
| Respondents. | : |

**FREDA L. WOLFSON, U.S.D.J.**

## I. INTRODUCTION

This matter has been opened to the Court by Respondents' filing of a motion to dismiss the instant Petition as untimely under the one-year limitations period established by The Anti-Terrorism and Effective Death Penalty Act ("AEDPA"). (ECF No. 16.) Petitioner Julius Davis ("Petitioner" or "Davis") acknowledges that his Petition is untimely but is seeking to excuse the Petition's untimeliness based on the actual innocence exception to procedural default recognized in *Schlup v. Delo*, 513 U.S. 298 (1995), and extended to include time-barred petitions in *McQuiggin v. Perkins*, 569 U.S. 383 (2013). For the reasons explained in this Opinion, the Court finds Petitioner has not presented new reliable evidence of his actual innocence; the Court will, therefore, grant the motion to dismiss, dismiss the Petition as untimely, and deny a Certificate of Appealability ("COA").

## II. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

The following factual summary of the underlying crime and Petitioner's state court proceedings is taken from the New Jersey Appellate Division Opinion affirming Petitioner's conviction and sentence.

1

On April 29, 2002, at about 11:30 p.m., Detective James McMillan (McMillan) of the Trenton Police Department was dispatched to a residence on Houghton Avenue based on a report that a woman had been shot. When McMillan arrived, he observed seventeen-year-old Rasheeda Hightower lying on the ground. She had suffered a fatal gunshot wound to the head. Several police officers were also present, and McMillan was advised that Rashaad Williams (Williams), the victim's brother and a witness to the shooting, was in custody in the back of a patrol vehicle. McMillan testified that Williams was "violently upset and acting out, and it was determined that he needed to be placed in custody in order to get some kind of control over him."

The officers canvassed the area for witnesses and transported several witnesses to police headquarters to be interviewed. Following the initial investigation, two suspects were identified, defendant[1] and his cousin, co-defendant Andre Jones.

After obtaining an arrest warrant for Jones, the police took him into custody and advised him of his *Miranda* rights. He waived his rights and agreed to provide a statement to the police. However, McMillan subsequently learned the information Jones provided was not entirely accurate and two days later, when he questioned Jones again, Jones provided a second statement. In his second statement, Jones said he believed his cousin fired a gun into the air to clear the crowd so he and Williams could have a "straight up fight." However, at trial, Jones acknowledged he did not want to testify against his cousin, and he claimed he was "under a lot of pressure" when he gave his statements to McMillan.

During the trial, Cicely Jackson, Williams's girlfriend, testified she lived on Houghton Avenue with Williams and her two children when the shooting occurred. Jackson explained that several people were at her home at the time: Rasheeda Hightower (the victim), and her brother, Rashaad Williams; Jackson's two children; a neighbor named Rory; Jackson's two brothers; and two friends of Williams. Jackson also testified that prior to the shooting, the adults were drinking beer, smoking marijuana, and using cocaine.

In addition, Jackson testified that at about 9:40 p.m., Rory told her to go outside because Williams was arguing with Jones, defendant's cousin. When the argument between Williams and Jones escalated into a physical altercation, Jackson's brothers "jumped in the fight." The fight ended when Jones got in his car and drove off stating, "I'll be back."

---

[1] "Defendant" refers to Petitioner Julius Davis.

2

According to Jackson, Rory then obtained "a little silver rusty gun" and "brought it to the house," but its "barrel was broken" so Williams tried to fix it. About twenty minutes later, Jones returned while Williams was on the porch. Williams jumped off the porch with the gun and aimed it at Jones, but "the barrel fell out" and the two men began fighting again. When Jones seemed to be getting the upper hand, Rasheeda Hightower started punching Jones and Jackson's two brothers joined the fight as well.

Jackson testified she saw defendant watching the fight and when she realized he had a gun in his right hand, she yelled, "run, that's his cousin, he got a gun, run." At that point, according to Jackson, defendant "just started shooting the gun." When Jackson was asked to describe how defendant was holding the gun, she stated he was "pointing [at] about eleven o'clock." Jackson said there were "a lot of rounds going off," but she did not know how many shots were fired because she and her friends ran into her house when defendant started shooting. Jackson testified that after she went back outside, she saw Rasheeda laying face down on the sidewalk.

When Jackson was interviewed at the police station, she did not initially tell the police that Williams had a gun because it was broken and she did not want him to get in trouble. She also testified the alcohol and drugs she consumed that night did not affect her ability to observe and perceive the events that occurred.

Rashaad Williams testified he witnessed defendant fire at least two shots "straight up" into the air, which caused everyone to run into Jackson's house. He also testified he did not inform the police he had a broken gun because he was "stressed and depressed" after his sister's death and afraid of getting in trouble.

Co-defendant Andre Jones, defendant's cousin, was the State's next witness. He testified that after the first fight, he "went looking for" his cousins to let them know he "had just got jumped." According to Jones, he told defendant he wanted to have a "straight up" fight with Williams, and defendant agreed to go with him to "arrange a straight up fight." Jones testified that neither he nor defendant mentioned bringing a gun to the fight. However, Jones admitted he was charged with unlawful possession of a gun as a result of the shooting and that he pled guilty to the charge. Jones also confirmed that during his second fight with Williams, he "heard some shots," but he claimed he did not know "who was shooting."

Sergeant Ivan Mendez testified he responded to the scene at about 11:35 p.m. on April 29, 2002, and recovered a total of nine nine-millimeter spent shell casings. New Jersey State Police

3

Sergeant William Wheatley, a ballistics and firearms expert, examined the nine shell casings recovered from the scene and determined they were all discharged from the same firearm, a nine-millimeter Luger pistol. However, the police never recovered a gun in connection with the shooting.

Dr. Raafat Ahmad, a medical examiner, also testified as an expert witness for the State. Dr. Ahmad performed an autopsy on the victim and found that the cause of death was a gunshot wound to the head.

Defendant made a motion for acquittal under [N.J. Ct.] Rule 3:18–1 at the close of the State's case, arguing the State had not met its burden of proof as to the elements of each offense, but the motion was denied. Defendant did not testify or call any witnesses on his own behalf.

After the jury rendered its verdict, defendant filed a motion for a new trial "based upon newly discovered evidence," claiming two potential witnesses could have provided exculpatory testimony. In a certification dated December 27, 2007, defendant's new attorney alleged that one of the potential witnesses[, Ms. Jackie Marks,] had personal knowledge of defendant's "involvement (or lack thereof)" in the shooting, and the other witness, [Robert McIntosh,] an inmate at the Mercer County jail, could "state with certainty" that defendant did not commit the offenses. However, defense counsel did not produce an affidavit or certification from either of the potential witnesses, and the court denied defendant's motion because it failed to "meet the *Carter* test."[2]

In a letter to the court dated April 24, 2008, defendant requested reconsideration of his motion for a new trial based on an "unsolicited" letter from another inmate, Robert Wilson, to defendant's attorney dated April 20, 2008. Wilson wrote, "I was there that night when that young lady got shot and your client wasn't the one that shot her." Wilson stated he was writing the letter of his own free will, but failed to explain why he had not come forward for almost six years since the shooting on April 29, 2002. Defendant's attorney advised the court that Wilson had been charged with aggravated manslaughter and that Wilson's attorney refused to allow him to speak with Wilson.

---

[2] "In *State v. Carter*, 85 N.J. 300, 314, 426 A.2d 501 (1981), the Court held that: "the new evidence must be (1) material to the issue and not merely cumulative or impeaching or contradictory; (2) discovered since the trial and not discoverable by reasonable diligence beforehand; and (3) of the sort that would probably change the jury's verdict if a new trial were granted."

4

> During defendant's sentencing hearing, the court recalled "there were many shots fired ... and, obviously, one of them found Ms. Hightower and killed her instantly." The court denied defendant's motion to be sentenced as a second-degree offender under N.J.S.A. 2C:44–1(f)(2) and also denied defendant's request to reconsider his motion for a new trial. After finding aggravating factor six (defendant's prior criminal record), N.J.S.A. 2C:44–1(a)(6); aggravating factor nine (the need for deterrence), N.J.S.A. 2C:44–1(a)(9); and mitigating factor eleven (imprisonment would entail excessive hardship for defendant's dependents), N.J.S.A. 2C:44–1(b)(11), the court sentenced defendant to a twenty-year prison term for aggravated manslaughter, subject to NERA.

*State v. Davis*, 2010 WL 4074947, at *1–4 (App. Div. Aug. 2, 2010).

Davis appealed, arguing, in relevant part, that the trial court erred in denying his motion for a new trial based on newly discovered evidence and his request for reconsideration of that motion. The Appellate Division rejected his arguments as follows:

> In his third point, defendant contends the trial court erred in denying his motion for a new trial based on newly discovered evidence and his request for reconsideration of that motion. Generally, "[t]he trial judge on defendant's motion may grant the defendant a new trial if required in the interest of justice." R. 3:20–1. In this case, the trial court determined that defendant failed to establish that the letter from Robert Wilson or the alleged statements from the two additional witnesses were material and "not merely cumulative or impeaching or contradictory," and that they "would probably change the jury's verdict if a new trial were granted." *Carter*, *supra*, 85 N.J. at 314, 426 A.2d 501. We agree that defendant's "new evidence," which was unsupported by a certification or affidavit, merely contradicted the testimony of several witnesses presented at trial, including Cicely Jackson and Rashaad Williams, and we affirm the denial of defendant's motion for a new trial substantially for the reasons stated by the trial court.

*Davis*, 2010 WL 4074947, at *5. The Appellate Division also rejected Defendants other direct appeal arguments and affirmed his conviction and sentence. *See id.* at *6. The New Jersey Supreme Court denied his petition for certification on January 7, 2011. *State v. Davis*, 205 N.J. 78 (2011).

5

On December 12, 2014, Petitioner filed a petition for PCR. (ECF No. 16, Exhibit 16.) In relevant part, Petitioner argued that his PCR should not be barred by the five-year limitations period and that trial counsel was ineffective for failing to obtain exculpatory statements from witnesses Jackie Marks, Robert McIntosh, and Robert Wilson. The PCR Court denied Petitioner's PCR, finding it barred by N.J. Ct. R. 3:22-12, as it was filed outside the five-year period set forth in the Rule and meritless. (*See* ECF No. 16, Exhibit 18.) In a comprehensive written opinion, the PCR court found: ( 1) defendant's petition was time-barred as he had not demonstrated excusable neglect for his late filing; and (2) defendant had not made out a *prima facie* case of ineffective assistance of counsel. The PCR court noted that defendant's unsupported representations as to Marks were contradicted by her pretrial statement to police. Moreover, defendant did not provide supporting affidavits from McIntosh or Wilson, nor did he establish their willingness to testify at trial. (*See id.*)

Davis appealed, and on June 26, 2017, the Appellate Division affirmed the denial of PCR in a sua sponte Order. (ECF No. 16, Exhibit 22.) As to the merits of Petitioner's ineffective assistance of counsel claims, the Appellate Division found that Petitioner's inadequate investigation claim was fatally defective because he did not submit supporting affidavits or certifications from Marks, MacIntosh, or Wilson, setting forth the additional relevant information in their possession that counsel should have discovered. The Appellate Division noted that it had already held on appeal that the information from these individuals was not exculpatory and did not provide a basis for disturbing Davis's convictions. *See id.* The Supreme Court denied certification on January 12, 2018. *State v. Davis*, 232 N.J. 62 (2018).

The instant habeas Petition is dated March 4, 2018. (ECF No. 1.) On December 4, 2018, the Court issued an Order to Show Cause directing Petitioner to show cause as to why his

6

Petition should not be dismissed as untimely. (ECF No. 5.) On January 7, 2019, Petitioner submitted a response to the Order to Show Cause, acknowledging the untimeliness of the Petition and asserting his actual innocence based on the evidence he provided to the state court in his motion for a new trial and PCR.[3] (*See* ECF No. 6.) On January 15, 2019, Court directed the Respondents to file an answer, or alternatively, to file a motion to dismiss to the extent the Petition was untimely. (ECF No. 7.) Respondents sought and received several extensions of time and filed the instant motion to dismiss on July 31, 2019, arguing in relevant part that the Petition is untimely and Petitioner does not establish his actual innocence. (ECF No. 16.)

In his Response to Respondents' motion to dismiss, Petitioner again relies on his response to the Order to Show Cause. (ECF No. 17.) He has also provided an additional notarized Declaration, dated April 3, 2019, from Andre Jones, Plaintiff's cousin and codefendant, who testified at trial. (*See id.*)

### III. ANALYSIS

#### a. The Petition is Untimely

The AEDPA creates a one-year limitations period for habeas petitions by state prisoners, which typically begins to run when the underlying judgment "bec[omes] final by the conclusion of direct review or the expiration of the time for seeking such review." 28 U.S.C. § 2244(d)(1)(A); *see also Ross v. Varano*, 712 F.3d 784, 798 (3d Cir. 2013). Where a habeas petitioner has previously pursued direct appeal to a state high court, the limitations period begins to run upon the expiration of time to petition for *certiorari* from the United States Supreme Court. *See Jenkins v. Superintendent of Laurel Highlands*, 705 F.3d 80, 84 (3d Cir. 2013).

---

[3] This evidence is discussed in more detail in the analysis section of this Opinion.

On direct appeal of Petitioner's conviction and sentence, the New Jersey Supreme Court denied his petition for certification on January 7, 2011. As Davis did not seek certiorari from the United States Supreme Court, his criminal judgment became final, and his AEDPA limitations period concluded, 90 days later, on April 7, 2011. Accordingly, the AEDPA limitations period for commencing a habeas proceeding expired in April 2012 and this Petition, filed in March 2018, is untimely. While the AEDPA limitations period may be statutorily tolled by the proper filing of a state PCR petition, 28 U.S.C. § 2244(d)(2), Davis did not file his PCR petition until December 2014, more than two and a half years after his time to file a habeas petition had already expired. As such, the Petition is untimely unless the Petitioner can establish a basis for equitable tolling.[4]

### b. Actual Innocence Exception

Petitioner acknowledges that his Petition is untimely but is seeking to excuse his Petition's untimeliness based on the actual innocence exception to procedural default recognized in *Schlup v. Delo*, 513 U.S. 298 (1995), and extended to include time-barred petitions in *McQuiggin v. Perkins*, 569 U.S. 383 (2013). To qualify for this exception, a petitioner must present new, reliable evidence showing it is more likely than not that no reasonable juror would have voted to convict him. *Schlup*, 513 U.S. at 324, 329. Where the petitioner makes the required

---

[4] The United States Supreme Court has held that the habeas time bar is not jurisdictional but is instead subject to equitable tolling. *See Holland v. Florida*, 560 U.S. 631, 645-46 (2010). In *Holland*, the Supreme Court held that equitable tolling is proper where the petitioner "shows (1) that he has been pursuing his rights diligently, and that some extraordinary circumstance stood in his way and prevented timely filing." *Id.* at 649. Here, Petitioner does not argue that he is entitled to equitable tolling based on extraordinary circumstances and reasonable diligence and has not provided any extraordinary circumstances that would justify equitable tolling. Rather, he seeks to excuse his Petition's untimeliness based on the actual innocence exception, which is discussed below.

showing, the exception provides a gateway to federal review of the petitioner's otherwise procedurally barred claim of a constitutional violation. *McQuiggin*, 569 U.S. at 386, 392. This "exception[ ] is grounded in the 'equitable discretion' of habeas courts to see that federal constitutional errors do not result in the incarceration of innocent persons," and it "survived AEDPA's passage." *Id.* at 392-93. In this context, actual innocence refers to factual innocence, not legal insufficiency. *Sistrunk v. Rozum*, 674 F.3d 181, 191 (3d Cir. 2012) (citation omitted).

To satisfy this standard, first, "a petitioner must present new, reliable evidence" and second, "show by a preponderance of the evidence 'that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence,'" *Houck v. Stickman*, 625 F.3d 88, 93 (3d Cir. 2010) (citing and quoting *Schlup*, 513 U.S. at 324, 327), or stated differently, that it is "more likely than not any reasonable juror would have reasonable doubt," *House v. Bell*, 547 U.S. 518, 538 (2006).

The threshold requirement for applying the actual innocence standard is "new evidence" supporting the petitioner's innocence. The Third Circuit has held that when a state prisoner asserts ineffective assistance of counsel based on counsel's failure to discover or present to the fact-finder the very exculpatory evidence that demonstrates his actual innocence, such evidence constitutes new evidence for purposes of the actual innocence miscarriage of justice gateway to excusing procedural default of a state prisoner's federal habeas claim. *See Reeves v. Fayette SCI*, 897 F.3d 154, 164 (3d Cir. 2018). As part of the reliability assessment of the first step, the court "may consider how the timing of [the petitioner's] submission and the likely credibility of the [witnesses] bear on the probable reliability of that evidence," as well as the circumstances surrounding the evidence and any supporting corroboration. *House*, 547 U.S. at 537, 551 (internal quotation marks and citation omitted); *see also McQuiggin*, 569 U.S. at 399.

In evaluating the second step—whether it is more likely than not no reasonable juror would convict the petitioner—the court "must consider all the evidence, old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under rules of admissibility that would govern at trial." *House*, 547 U.S. at 538 (internal quotation marks and citation omitted). "[M]ere impeachment evidence is generally not sufficient to satisfy the [actual innocence gateway] standard." *Munchinski v. Wilson*, 694 F.3d 308, 338 (3d Cir. 2012). The reliability of the evidence is also considered in step two of the analysis in which the court must predict the likely impact of the new evidence on the jury. *See Goldblum v. Klem*, 510 F.3d 204, 226 (3d Cir. 2007). Furthermore, "[u]nexplained delay in presenting new evidence [also] bears on the determination whether the petitioner has made the requisite showing." *McQuiggin*, 569 U.S. at 399. In weighing the evidence, "[t]he court's function is not to make an independent factual determination about what likely occurred, but rather to assess the likely impact of the evidence on reasonable jurors"; the actual innocence standard "does not require absolute certainty about the petitioner's guilt or innocence." *House*, 547 U.S. at 538.

Nevertheless, the gateway actual innocence standard is "demanding" and satisfied only in the "rare" and "extraordinary" case where "a petition presents evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error." *McQuiggin*, 569 U.S. at 386, 392 (internal quotation marks and citations omitted).

At issue here is whether Petitioner has presented new reliable evidence of his actual innocence. In order to pass through the gateway and argue the merits of his underlying claims, Plaintiff must present "new reliable evidence ... not presented at trial," *Hubbard*, 378 F.3d at 340

(internal quotation marks and citation omitted), such as "exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence." *Schlup*, 513 U.S. at 324.

Petitioner asserts that his attorney failed to investigate and call at trial three witnesses who would have provided exculpatory testimony at trial. Pursuant to *Reeves*, the Court assumes that (1) evidence in the possession of Petitioner's attorney but not used at trial or (2) evidence Petitioner's attorney failed to discover would qualify as "new evidence" for purposes of the actual innocence inquiry. The Court nevertheless finds that Petitioner has not provided new reliable evidence of his actual innocence and thus fails to show that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence.

The evidence submitted by Petitioner as to these three witnesses is not reliable or exculpatory. The certification dated December 27, 2007, by Petitioner's new attorney alleges only that Ms. Jackie Marks, had personal knowledge of defendant's "involvement (or lack thereof)" in the shooting. The attorney's certification states that another witness, Robert McIntosh, an inmate at the Mercer County jail, could "state with certainty" that defendant did not commit the offenses and could identify the perpetrators of the offenses. Notably, however, the attorney's certification indicates that Petitioner provided counsel with this information regarding Marks and McIntosh, and Petitioner's attorney did not provide the state court with an affidavit or certification from either of the potential witnesses. Furthermore, Petitioner's unsupported representations as to Jackie Marks were contradicted by her pretrial statement to police. Petitioner also presents a letter, purportedly written by Mr. Robert Wilson in 2008 and sent unsolicited to Petitioner's counsel, stating that Petitioner was not responsible for the shooting. Petitioner's counsel did not provide the state court with an affidavit from Wilson. Nor has Petitioner provided this Court with <u>affidavits from Marks, McIntosh or Wilson, detailing</u>

11

<u>their willingness to testify at trial and what they would have testified to at trial</u>. The state court found that Petitioner's "new evidence" was insufficient to warrant a new trial under state law, as it was unsupported by certification or affidavit and was not exculpatory as it merely contradicted the testimony of several witnesses presented at trial, *see Davis*, 2010 WL 4074947, at *5. In his PCR, the state court also found that Petitioner did not establish prejudice under *Strickland*.[5] Here too, the proffered evidence from the three witnesses is vague and unsupported by affidavit. As such, it is neither reliable nor so probative of innocence that no reasonable juror would have convicted Petitioner.

Petitioner has also provided a notarized Declaration from codefendant Andre Jones, his cousin who testified at trial. In the Declaration, Jones states that he was present at the scene on April 29, 2002, and has "personal knowledge that Julius Davis did not commit the offense(s) he was convicted [of] by a jury" and that Jones "pe[r]sonally seen [sic] the person who shoot [sic] Rasheeda Hightower on April 29, 2002, on 42 Houghton Ave. in the City of Trenton, New Jersey and it wasn't Julius Davis." (ECF No. 17, Davis Decl. at ¶ 2.)

The Declaration by Jones, submitted nearly eighteen years after the shooting in question, is not reliable because it contradicts, without any explanation, Jones's trial testimony. In his direct trial testimony, Jones stated that he heard shots fired and did not know where the shots were coming from or who was shooting. (ECF No. 16-1, 3T:186-24 to 3T 187-7.) Jones also acknowledged at trial that he had given two prior statements in which he indicated that he

---

[5]In *Strickland v. Washington*, 466 U.S. 668 (1984), the United States Supreme Court set forth the standard for claims of ineffective assistance of counsel in violation of the Sixth Amendment. Counsel is presumed to have acted effectively unless the petitioner demonstrates both that "counsel's representation fell below an objective standard of reasonableness" and that there was "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. at 686-88, 693-94.

believed Davis was going to fire a gun into the air to clear the crowd so Jones and Rasheed could fight. (*Id.*, 3T 194-19 to 3T 195-1.) He stated that the prior statement was given out of fear. (*Id.*, 3T:195-2 to 3T 106-13.) Jones later admitted on cross-examination that he had seen Petitioner with a gun on the night of the shooting. (*Id.*, 3T:198-18 to 20.) In light of the passage of so many years and Jones's prior testimony at trial, Jones's statement that 1) he saw the shooter and 2) it was not Petitioner is <u>not</u> a trustworthy eyewitness account, especially because Jones provides no explanation as to why he waited so long to reveal these details and did not provide this testimony at trial. As such, the Court finds that the Declaration provided by Andre Jones is not reliable evidence of Petitioner's actual innocence. Nor would a jury find reliable his testimony that he saw the shooter and it was not Davis, given Jones's contradictory testimony at trial.

For these reasons, the Court finds that Petitioner has not provided new reliable evidence of his actual innocence and fails to show that it is more likely than not that no reasonable jury would have convicted him in light of the new evidence. As such, the Court will dismiss the Petition as untimely under AEDPA.

### IV. <u>CERTIFICATE OF APPEALABILITY</u>

Pursuant to 28 U.S.C. § 2253(c), unless a circuit justice or judge issues a certificate of appealability ("COA"), an appeal may not be taken from a final order in a proceeding under 28 U.S.C. § 2254. A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller–El v. Cockrell*, 537 U.S. 322, 327 (2003).

"When the district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim[s], a COA should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Didiano v. Balicki*, Civil Action No. 09–2315 (FLW), 2010 WL 1752191, at *6-7 (Apr. 29, 2010) (citing *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)). Here, reasonable jurists would not find the Court's procedural ruling debatable. Accordingly, no certificate of appealability shall issue.

## V. **CONCLUSION**

Because the Court has determined that the Petition is untimely, and Petitioner has not provided new reliable evidence of his actual innocence or shown that it is more likely than not that no reasonable jury would have convicted him in light of the new evidence, the Court will dismiss the petition as untimely. The Court also denies a COA. An appropriate Order follows.

/s/ Freda L. Wolfson
Freda L. Wolfson
U.S. Chief District Judge

DATED: February 27, 2020